# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1894
_____

United States of America,      *
     *
     Plaintiff-Appellee,      *
     *
     v.      *
     *
Fredrick Melvin Getzschman, Jr.,      *
     *
     Defendant-Appellant.      *

_____

No. 03-1896
_____

Appeals from the United States
District Court for the
Southern District of Iowa.

United States of America,      *      [UNPUBLISHED]
     *
     Plaintiff-Appellee,      *
     *
     v.      *
     *
Fredrick Melvin Getzschman, III,      *
     *
     Defendant-Appellant.      *

_____

Submitted: October 23, 2003

Filed: November 28, 2003
_____

Before LOKEN, Chief Judge, LAY and BOWMAN, Circuit Judges.
_____

PER CURIAM.

Fredrick Melvin Getzschman, Jr. ("Fred Getzschman") and his son Fredrick Melvin Getzschman, III ("Rick Getzschman") were convicted of conspiracy to make and pass false or fictitious financial instruments in violation of 18 U.S.C. §§ 371 and 514(a)(1). In addition to the conspiracy conviction, Fred Getzschman was convicted of four counts of producing, passing, and attempting to pass fictitious money orders in violation of 18 U.S.C. §§ 514(a)(1) and (2), and Rick Getzschman was convicted of two counts of passing and attempting to pass fictitious sight drafts in violation of § 514(a)(2). They appeal their convictions and sentences, contending § 514(a) is void for vagueness and claiming the district court[1] erred by (1) allowing the government to introduce evidence of prior bad acts pursuant to Federal Rule of Evidence 404(b); (2) failing to instruct the jury on a knowledge element of § 514(a); (3) failing to grant their motions of acquittal; and (4) believing it did not possess the authority to depart downward on the ground that the amount of intended loss overstated the seriousness of the offense. Fred Getzschman also appeals the calculation of his base offense level, contending the district court erred in calculating the amount of the intended loss and applying a two-level adjustment for more than minimal planning. We affirm.

## I.    BACKGROUND

Fred and Rick Getzschman were involved in the "common law" movement, whose adherents believe they are not subject to state or federal laws. One theory of the common law movement is the so-called "redemption" theory, which teaches that individuals can utilize the Uniform Commercial Code to create fictitious "Treasury Direct Accounts" in the United States Treasury Department. According to the redemption theory, the United States went bankrupt when it rejected the gold standard

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

in 1933 and thereafter covered the country's debt by converting the physical bodies of its citizens into assets.

Followers of the redemption theory believe each citizen has a "private side" and a "public side." The theory provides that the government owns each citizen's public side or "straw man" by holding title to each citizen's birth certificate. By filing UCC-1 financing statements and their birth certificates in a state that accepts such filings, followers of this theory believe they can "redeem" their birth certificates. Redemption theorists view the redeemed birth certificate as an asset on which they place a value of up to $2 million and assert the U.S. Treasury Department acts as a clearinghouse for the funds. Under this theory, they then create money orders and sight drafts drawn on their Treasury Direct Accounts to pay for goods and services.

Fred and Rick Getzschman attempted to use the redemption theory to obtain goods and property. Fred Getzschman twice ordered goods from Land's End and used money orders drawn on the Department of Treasury to pay for the goods. Although no goods were ever shipped, Land's End issued a refund check for $375.88 on one order. Fred Getzschman attempted to purchase a computer from Gateway Computers using a money order drawn on the Department of Treasury. He took possession of the computer, which was seized during the execution of a search warrant. Fred Getzschman also attempted to use a money order drawn on the Department of Treasury to purchase two Ford vehicles. No vehicles were ever delivered and the money order was never negotiated.

Rick Getzschman attempted to purchase a Toyota Land Cruiser using a sight draft drawn on the Department of Treasury and also attempted to purchase thirty-one acres of property known as the Chroman estate using a sight draft for $3.25 million. Rick Getzschman never received the vehicle or purchased the property.

During trial, the district court allowed the Government to introduce evidence of Rick Getzschman's 1995 visit to the Montana Freeman Ranch and alleged involvement in a Montana Freemen check-cashing scheme in 1995. At the close of the Government's case, the Getzschmans' motions for judgment of acquittal were denied. The jury found both Defendants guilty on all counts.

For sentencing purposes, the district court found the amount of the intended loss under the sentencing guidelines ($3,393,257.66) to be the same for both Fred and Rick Getzschman. The amount of the intended loss increased each Defendant's base offense level by thirteen levels. United States Sentencing Commission, Guidelines Manual, § 2F1.1(b)(1)(N) (Nov. 2000). The district court also imposed a two-level increase because the offense involved more than minimal planning. U.S.S.G. § 2F1.1(b)(2). Both Defendants moved for a downward departure because the amount of the intended loss overstated the seriousness of the offense. U.S.S.G. § 2F1.1, comment. (n.11). Fred Getzschman also argued a departure was warranted because this case was atypical for § 514(a) cases. U.S.S.G. § 5K2.0. The district court recognized it had the authority to depart from the guidelines but decided not to exercise this discretion. Fred Getzschman was sentenced to fifty-one months and a term of three years supervised release. Rick Getzschman was sentenced to thirty-seven months and a term of three years supervised release.

## II.    DISCUSSION

On appeal, Fred and Rick Getzschman contend § 514(a) is void for vagueness. Section 514(a), in relevant part, prohibits the production and passing, with the intent to defraud, of "any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States. . . ." 18 U.S.C. § 514(a). The Defendants claim the statute is unconstitutionally vague because it does not define "false or fictitious instrument" or

"actual security or other financial instrument." They argue the statute is confusing because it prohibits use of "false or fictitious instruments" but requires such instruments to appear or purport to be "actual" securities or instruments of the United States. They question how the fictitious treasury direct money orders and sight drafts they used, which the Government conceded were not actual securities issued by the United States, could purport to be actual securities or other financial instruments under the statute. They argue the statute does not give an ordinary person sufficient notice that the fictitious instruments used in this case would be prohibited under the statute.

A criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 525 (1994) (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)). We conclude § 514(a) meets this standard.

The statute prohibits producing or passing fictitious financial documents appearing or purporting to be issued under the authority of the United States. This court previously has noted that the legislative history of § 514(a) indicates the statute covers wholly nonexistent types of financial instruments. United States v. Pullman, 187 F.3d 816, 823 (8th Cir. 1999). In United States v. Howick, 263 F.3d 1056, 1067-68 (9th Cir. 2001), the Ninth Circuit interpreted the phrase "false or fictitious instrument" to refer to "nonexistent instruments" and concluded unlawful fictitious instruments are ones that appear to be actual "in the sense that [they] bear[] a family resemblance to genuine financial instruments." The fictitious money orders and sight drafts used by the Defendants clearly fall within the meaning of § 514(a). On this basis, we reject their contention that § 514(a) is unconstitutionally vague as applied in this case.

We next address Fred Getzschman's argument that the district court incorrectly calculated the amount of the intended loss attributable to him. In calculating the amount of intended loss for Fred Getzschman, the district court added the face value of all the money orders and sight drafts produced or passed by Fred Getzschman and his son, including the $3.25 million sight draft produced by Rick Getzschman for the Chroman estate.[2] The district court concluded the $3.25 million sight draft should be included in Fred Getzschman's intended loss because it was reasonably foreseeable to him that his son would attempt to purchase the real estate for such a large sum.

Both Getzschmans were convicted of conspiracy to make and pass false or fictitious financial instruments. Under the sentencing guidelines, a conspirator may be held responsible for losses caused by his co-conspirators in furtherance of the conspiracy provided those losses were reasonably foreseeable to him. U.S.S.G. § 1B1.3(a)(1)(B); see also United States v. Whatley, 133 F.3d 601, 606-07 (8th Cir. 1998) (stating that the amount of loss charged to a defendant may include reasonably foreseeable losses caused by acts of co-workers in furtherance of a scheme to defraud). The district court concluded that because the $3.25 million was within the Defendants' "supposed available asset base," it was foreseeable to Fred Getzschman. (Sent. Tr. of Fred Getzschman at 17).

Our review of the district court's finding of the amount of the intended loss is limited to clear error. United States v. Whitehead, 176 F.3d 1030, 1042 (8th Cir. 1999). Although this case presents a close question, there is sufficient evidence to support the district court's finding that the $3.25 million sight draft was reasonably foreseeable to Fred Getzschman. The record reveals the Defendants lived together, followed the redemption theory, and attempted to use the theory to obtain goods and

---

[2]The face value of the money orders and sight drafts were as follows: Land's End - $1455.16; Gateway Computers - $3,149.00; Ford vehicles - $81,222.00; Toyota Land Cruiser - $57,431.50; Chroman estate - $3.25 million.

property using fictitious money orders and sight drafts. The Government presented evidence that Rick Getzschman claimed to have $100 million in his fictitious Treasury Direct Account, and the district court reasonably could have inferred Fred Getzschman knew this. We agree that it was reasonably foreseeable to Fred Getzschman that his son would attempt to use the entire amount of funds he claimed to have available. While there is no evidence Fred Getzschman participated in the attempted purchase of the Chroman estate, both Defendants were not required to participate jointly in order for their acts to be foreseeable to each other. We conclude the district court did not commit clear error in determining the amount of the intended loss attributable to Fred Getzschman.

## III.   CONCLUSION

We find the Getzschmans' other arguments to be without merit. Accordingly, we affirm the judgment and sentence of the district court.

AFFIRMED.

_____