

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-29-2008

# Monroe v. Beard

Precedential or Non-Precedential: Precedential

Docket No. 07-3711

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Monroe v. Beard" (2008). *2008 Decisions.* Paper 744.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/744

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 07-3711

———————

EDWARD MONROE, sui juris;
DEVON COLLINS, sui juris;
ANTHONY DICKERSON, sui juris;
GREGORY STOVER, sui juris;
ROBERT J. ROYSTER, sui juris;
CHARLES POULSON, JR., sui juris;
RICHARD K. JOHNSON, sui juris;
SALIM HICKMAN, sui juris;
HOWARD GIBSON, sui juris;
MAURICE EVERETT, sui juris;
ALEXANDER DAVIS, sui juris;
LAWRENCE BELSER, sui juris,
                                        Appellants

v.

JEFFREY A. BEARD, PH.D; DAVID DIGUGLIELMO;
SHAFFER, EXECUTIVE DEPUTY SECRETARY;
DONALD T. VAUGHN; MURRAY, DEPUTY;
BUZZARD, MAJOR; FIELD, MAJOR;

MICHAEL A. LORENZO; THOMAS DOHMAN;
SCOTT PASQUALE; JEFFREY BAKER;
SHARON LUQUIS; SYLVIA PALLOTT; ERIC JONES;
KNAUER, LT.; MOYER, LT.; RADLE, LT.; LT. OWENS;
GRUNDER, LT.; LINDA MILLER; KIM ULISNY;
MARY CANNINO; C/O HAISTON;
UNKNOWN ACCOMPLICE; LT. SCOTT BOWMAN;
C/O J. R. ANDALORA; SGT. VOJACEK; C/O STRONG;
C/O N. HALL; C/O N. HOLLIS; SGT. HALE;
C/O REESE; C/O SHORT; C/O A. CAMPBELL;
C/O LEBLANC; LT. A. FLAIMS;
C/O McMICHAEL; C/O D. M. WEAVER;
LT. LAPINKSKI; C/O STOKES; C/O ULKOWSKI

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 05-cv-04937
(Honorable Lawrence F. Stengel)

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 20, 2008

Before:  SCIRICA, Chief Judge,
HARDIMAN and STAPLETON, Circuit Judges.

(Filed: July 29, 2008)

2

Edward Monroe
Devon Collins,
Anthony Dickerson,
Gregory Stover,
Robert J. Royster,
Charles Poulson, Jr.,
Salim Hickman,
Howard Gibson,
Maurice Everett,
Alexander Davis,
Lawrence Belser,
          Appellants, Pro Se

Claudia M. Tesoro, Esquire
Office of Attorney General of Pennsylvania
21 South 12th Street, 3rd Floor
Philadelphia, Pennsylvania 19107
          Attorney for Appellees

---

OPINION OF THE COURT

---

PER CURIAM.

3

Fifteen current and former inmates[1] at the State Correctional Institute (SCI) at Graterford, Pennsylvania filed a pro se lawsuit in the United States District Court for the Eastern District of Pennsylvania against various employees of the Pennsylvania Department of Corrections (DOC). Brought in forma pauperis and pursuant to 42 U.S.C. § 1983, the complaint alleged that the defendants violated the plaintiffs' constitutional rights by confiscating their legal materials, including certain publications and Uniform Commercial Code (UCC) materials. The District Court granted the defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6) and their motion for summary judgment. Because the plaintiffs have not established that the defendants' confiscation of their materials violated their constitutional rights, we will affirm the District Court's dismissal of their lawsuit.

---

[1]We note that only twelve of the original plaintiffs appealed. Furthermore, as this appeal was pending, Appellees filed a suggestion of death pursuant to Fed. R. App. P. 43(a)(1) advising this Court of the death of Appellant Richard K. Johnson. After receiving responses from both sides and noting that a personal representative had not been appointed through the appropriate county's Register of Wills or Orphan's Court to represent Johnson's interests, the Clerk issued an order dated March 26, 2008, dismissing Appellant Johnson as a party to the appeal. No response by a properly appointed representative has been filed since that order was issued.

I.  Background

In 2004, William Fairall, DOC Deputy Chief Counsel, learned that inmates at prisons across the country were filing fraudulent liens and judgments against prosecutors and prison officials.[2]  Evidently, inmates were filing financing statements

_____

[2]In federal criminal and civil prosecutions of inmates filing false commercial liens against prosecutors, judges, corrections officers and other government employees, courts have uniformly declared those liens null and void.  See, e.g., United States v. Joiner, 418 F.3d 863 (8th Cir. 2005)(affirming judgment of conviction of conspiracy to injure a judicial officers in their property and to intimidate judicial officers in the discharge of their duties against defendant-inmates who filed false UCC liens against judges and prosecutors); United States v. Speight, 75 Fed.Appx. 802 (2d Cir. 2003)(affirming judgment of conviction against defendant-inmates claiming that government officials owed them multi-million dollar debts and filing fraudulent liens to obtain those "debts"); United States v. McKinley, 53 F.3d 1170 (10th Cir. 1995)(affirming order declaring false commercial lien, filed by defendant-inmate against prosecutor and judge, "null, void and of no legal effect"); United States v. Martin, 356 F.Supp.2d 621 (W.D. Va. 2005)(granting government's request for civil injunctions and monetary damages against defendant-inmates who filed false commercial liens against judges and prosecutors); United States v. Orrego, No. 04-CV-0008SJ, 2004 WL 1447954 (E.D.N.Y. June 22,

5

under Article 9 of the UCC, which sets forth a process for perfecting security interests in property. [3] These liens and judgments, accessible on financing statement forms, are easy to file. Once registered, however, the fraudulent liens are very burdensome to remove. For example, in a New Jersey incident, criminal defendants registered a fraudulent $14.5 million lien with the New Jersey Department of Revenue against a federal prosecutor and a $ 3.5 million lien against a federal judge for using their "copyrighted" names in court papers and hearings; it took a federal court order to remove them. In addition to the substantial effort and expense required to expunge the liens, the fraudulent filings ruined the victims' credit reports. See Decl. of William Fairall, Deputy Chief Counsel of the Department of

---

2004)(granting injunction and an award of money damages in civil action brought by the government against defendant-inmates who filed fraudulent liens against judge as retribution for using inmate's "copyrighted" name); United States v. Anderson, No. 97C821, 1998 WL 704357 (N.D. Ill. Sept. 25, 1998)(granting declaratory, injunctive and monetary relief for government in action against defendant-inmate who filed commercial liens against judge, prosecutor, and his public defender).

[3]The inmates have filed these commercial liens with state departments of revenue, departments of state, or other the state agencies responsible for receiving and recording these financial instruments.

Corrections ¶¶ 3-7; Third Decl. Of John W. Moyer, Lieutenant, Internal Security Office, SCI-Graterford, ¶¶ 3-4; John Shiffman, Defendants Go on the Offensive, PHILADELPHIA INQUIRER, Jun. 6, 2004, at B1.[4]

---

[4]Further investigation revealed that various publications were advocating the exploitation of the UCC filing process and provided explicit instructions on how to perfect these fraudulent security interests, including sample financing statements forms. One instruction book, Cracking the Code, calls for the use of commercial law to resist authority, including the correctional and judicial systems. The book adheres to the "Redemptionist" theory, which propounds that a person has a split personality: a real person and a fictional person called the "strawman." The "strawman" purportedly came into being when the United States went off the gold standard in 1993, and, instead, pledged the strawman of its citizens as collateral for the country's national debt. Redemptionists claim that government has power only over the strawman and not over the live person, who remains free. Individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, the real person can demand that government officials pay enormous sums of money to use the strawman's name or, in the case of prisoners, to keep him in custody. If government officials refuse, inmates are encouraged to file liens against correctional officers and other prison officials in order to extort their release from prison. Adherents of this scheme also advocate that inmates copyright their names to justify filing liens

7

In 2004, security staff at various DOC institutions reported that inmates were receiving information and documents concerning the filing of liens under the UCC. Additionally, in June 2005, the DOC discovered that a Pennsylvania inmate had filed a fraudulent lien against a state court judge, a superintendent, and DOC Secretary Jeffrey Beard (a defendant in this action); although the DOC sought to expunge the lien and the Pennsylvania Department of State issued adjudications declaring the financing statements fraudulent, the inmate appealed both adjudications. Moreover, officials learned that inmates within the DOC were charging others fees of up to $1,500 to start the UCC redemption process

As a result of these events, in July 2005, DOC management issued a memorandum to all its institutions, declaring as "contraband" all UCC forms, documents relating to UCC filings, materials on "redemption" and copyrighting names, and publications regarding the "redemption or lien filings." Specifically, it established that the possession and receipt of these publications violated its policy on inmate mail privilege, DC-ADM 803, which prohibits "[w]ritings that advocate, assist or are evidence of criminal activity or facilitate misconduct." The memorandum also directed prison officials to investigate inmates believed to be engaged in copyrighting

---

against officials using their names in public records such as indictments or court papers. See Fairall Decl. ¶ 8; Shiffman, Defendants Go on the Offensive, supra, at B1, B4.

8

their names or filing liens. But it cautioned that the material should not be destroyed until inmates had an opportunity to object using an "Unacceptable Correspondence Form," indicating that they had an independent, legitimate purpose for possessing the items.

Informed of this policy, Internal Security Staff at SCI-Graterford began tracking and keeping a list of which Graterford inmates had been receiving these materials. In August 2005, Lieutenant Moyer instructed corrections officers to raid the cells of inmates on the list of names compiled. The officers entered the cells, strip-searched the inmates, ordered them to redress, handcuffed them, and ordered them to stand outside while the officers searched their cells. During this search, officers confiscated all of the inmates' contraband and non-contraband legal materials, including legal briefs, transcripts, notes of testimony, exhibits, copies of reference books, treatises, journals, and personal handwritten notes.

Following the search, the officers took the seized materials to the Internal Security Office and placed each inmate's materials into separate boxes. Each inmate received a letter setting forth the DOC's rationale for the raid and informing him that he could object to the searches by filling out an "Unacceptable Correspondence Form." From August 2005 to July 2006, Lieutenant Moyer conducted a preliminary review of the materials and evaluated which items were immediately returnable. In October and November 2005, he met with the inmates and offered to return the returnable items, but many

9

inmates refused the offer.[5]

A second set of reviews occurred in August 2006 after Moyer and legal counsel evaluated the confiscated materials and, for each inmate, created a list of documents that were and were not returnable. Moyer met with each of the inmates, presented him with the compiled list, and offered to let each inmate review his material and take back the returnable materials. Although four of the plaintiffs reviewed the materials, the rest refused to review any of the materials presented. All of the inmates refused to take back material that was deemed returnable.

Pursuant to a court order, in September and October 2006, Moyer and two other officers supervised a review of the materials by nine of the plaintiffs involved in this action. All but one of the plaintiffs refused defendants' offer to receive back items deemed returnable.

## II. Procedural History

After pursuing complaints through the both the prison's special and normal grievance procedures,[6] the plaintiffs filed the

---

[5]Although two plaintiffs accepted Moyer's offer to receive back materials, the rest of the plaintiffs refused, or had no legitimate material to be returned.

[6]For substantially the reasons set forth by the District Court, we agree that the formal grievance procedure was not available

instant lawsuit, which the District Court construed as arising under 42 U.S.C. § 1983. They collectively alleged that the defendants: (1) executed searches and seizures of plaintiffs' cells in violation of the Fourth Amendment; (2) inflicted unnecessary and wanton pain without penological justification in violation of the Eighth Amendment[7]; (3) confiscated their legal materials, thereby depriving them of their First Amendment right of access to the courts; (4) deprived them of property without Due Process under the Fourteenth Amendment; (5) deprived them of their First Amendment right to use UCC materials and publications advocating the redemption process and copyrighting their names; and (6) are engaged in activity violating the Commerce Clause and the Anti-Peonage Act. The District Court granted the defendants' motion pursuant to Fed. R. Civ. P. 12(b)(6) and dismissed their Fourth, Eighth, and First Amendment access to the courts claims, as well as their Commerce Clause and Anti-Peonage claims. However, it allowed their other claims to proceed. Thereafter, the defendants moved for summary judgment on the remaining claims, and the plaintiffs filed cross-motions for summary judgment. The District Court granted summary judgment for the

---

to the plaintiffs for the purposes of 42 U.S.C. § 1997e, and, accordingly, we find no procedural bar to reviewing the merits of this appeal.

[7]The plaintiffs do not pursue their Fourth and Eighth Amendment claims on appeal.

11

defendants and denied the plaintiffs' cross-motions.  Plaintiffs now appeal both orders.

### III.  Motion to Dismiss

We have jurisdiction over the District Court's orders pursuant to 28 U.S.C. § 1291.  We exercise plenary review over the District Court's order dismissing claims under Fed. R. Civ. P. 12(b)(6).  See Sands v. McCormick, 502 F.3d 263, 267 (3d Cir. 2007).  Reviewing such an order, we accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant.  Bright v. Westmoorland County, 380 F.3d 729, 735 (3d Cir. 2004).  To survive a motion to dismiss, "a plaintiff must allege facts that raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact)." Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007)(citing  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).

### A.  First Amendment, Access to Court Claim

Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts.  See Lewis v. Casey, 518 U.S. 343, 346 (1996).  However, prisoners may only proceed on access-to-courts claims in two types of cases, challenges (direct or collateral) to their sentences and conditions of confinement. See id. at 354-55. Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal

12

claim, they must show (1) that they suffered an "actual injury" – that they lost a chance to pursue a "nonfrivolous" or "arguable" underlying claim; and (2) that they have no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial of access suit. See Christopher v. Harbury, 536 U.S. 403, 415 (2002). To that end, prisoners must satisfy certain pleading requirements: The complaint must describe the underlying arguable claim well enough to show that it is "more than mere hope," and it must describe the "lost remedy."[8] See id. at 416-17.

In this case, the defendants confiscated all of the plaintiffs' contraband and non-contraband legal materials, including their legal briefs, transcripts, notes of testimony, exhibits, copies of reference books, treatises, journals, and personal handwritten notes. In their initial pleadings, the plaintiffs' claim rested solely on the ground that the defendants confiscated their legal materials, contraband and non-contraband alike. That claim, on its face, was insufficient to state a claim under Harbury. See id. So too were their subsequent amendments, which alleged that they lost the opportunity to pursue attacks of their convictions and civil rights claims but did not specify facts demonstrating that the claims were nonfrivolous. Nor did they maintain that they had no other

---

[8]In other words, the underlying claim should be pled in a manner that satisfies Fed. R. Civ. P. 8(a). Harbury, 536 U.S. at 417-18.

13

remedy to compensate them for their lost claims. Even liberally construing their complaints as we must do for pro se litigants, they do not sufficiently allege that they have suffered an actual injury.[9] See id.

Finally, we note that the defendants gave the plaintiffs three opportunities (one pursuant to a court order) to review their confiscated materials and receive back the approved, non-contraband items. Although some of the plaintiffs accepted back approved materials,[10] most of them either had non-returnable materials, or chose not to accept back the materials deemed acceptable. Plaintiffs do not dispute the adequacy of this post-seizure remedy for pursuing their "lost" claims, nor do they suggest that the contraband materials were critical to pursuing non-frivolous claims.

---

[9] Four plaintiffs – Davis, Collins, Everett and Pouslon – separately filed documents citing the legal proceedings they were pursuing when the defendants confiscated their legal materials. However, although they cite their "lost" proceedings, they nevertheless failed to plead facts showing that their claims were nonfrivolous or may no longer be pursued as a result of defendant's actions. Accordingly, we agree with the District Court that their allegations are unavailing under this claim.

[10] We note that Plaintiffs Hickman, Perry and Green accepted back approved materials.

Accordingly, we agree with the District Court that the plaintiffs have failed to state a claim for relief on the ground that they were denied their constitutional right of access to the courts.

## IV. Summary Judgment

We exercise plenary review over the District Court's order granting summary judgment. See Williams v. Consovoy, 453 F.3d 173, 178 (3d Cir. 2006). Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that there is no genuine dispute as to any material fact. Miller v. Indiana Hosp., 843 F.3d 139, 143 (3d Cir. 1998). In reviewing the District Court's grant of summary judgment, we view the facts in a light most favorable to the nonmoving party. Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 260 (3d Cir. 2007). When a moving party satisfies its burden of proving a prima facie case for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, "[t]here must be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).

15

## A.  First Amendment

Although "imprisonment does not automatically deprive a prisoner of . . . [First Amendment] protections," those constitutional rights may at times be restricted within the prison setting.  Beard v. Banks, 126 S. Ct. 2572, 2577-78 (2006).  We evaluate prison regulations alleged to violate an inmate's First Amendment right to possess publications and legal materials under the "reasonableness" test set forth in Turner v. Safley, 482 U.S. 78 (1987).  First, we assess whether there is a "'valid, rational connection' between the prison regulation and the legitimate interest put forth to justify it." Jones v. Brown, 461 F.3d 353, 360 (3d Cir. 2006).  If a rational relationship exists, we consider three other factors: "(1) whether inmates retain alternative means of exercising the circumscribed right . . . (2) the burden on prison resources that would be imposed by accommodating the right and (3) whether there are alternatives to the regulation that fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological objectives." Id. at 360-61.  However, prison administrators are not required to use the least restrictive means possible to further legitimate penological interests.  See Thornburgh, 490 U.S. at 411.

Ultimately, the party challenging the prison regulation bears the burden of showing that it is constitutionally unreasonable.  Id.  (citing Overton v. Bazzetta, 539 U.S. 126, 132 (2003)).  This burden is "heavy" because plaintiffs must overcome the presumption that prison officials acted within their "broad discretion."  See Shaw v. Murphy, 532 U.S. 223, 232

16

(2001). Nevertheless, prison administrators must come forward with a legitimate governmental interest that justifies the regulation, and they must demonstrate a rational connection between the policy and that interest. Jones, 461 F.3d at 360 (citing Wolf v. Ashcroft, 297 F.3d 305, 308 (3d Cir. 2002)). Although we accord substantial deference to their professional judgment, see Overton, 539 U.S. at 132, the defendant administrators' evidence must "amount to more than a conclusory assertion." Id.

In this case, plaintiffs assert that the DOC's confiscation of their publications and legal materials infringes on their First Amendment rights. The parties do not dispute the regulation's existence and its implementation. As the relevant penological interest, the defendants assert their interest in protecting prison administrators and other government officials from inmates filing bogus liens against them. The means they used to serve that interest was to designate certain materials (including inmate publications advocating the "redemption" theory, UCC materials, and information on copyrighting names) as contraband, execute searches of inmate cells, and seize all of their legal materials, including non-contraband items.

Our review of the record supports the District Court's conclusion that a rational nexus exists between the prison's penological interest and the means used. Defendants argue, and we agree, that as prison administrators they are entitled to regulate and prevent criminal activity within the DOC. In developing this policy, defendants point out that, nationwide,

17

prisoners have filed fraudulent liens against public officials, and that they have been subjected to criminal prosecution as a result.[11] It was frequently the case that the inmate-defendants in those cases used the same instruction manuals and UCC materials as those possessed by the plaintiffs here to file the false liens. Moreover, defendants had noticed that inmates within the Pennsylvania prisons, including SCI-Graterford, were receiving publications and documents encouraging the UCC, redemption, and name-copyrighting schemes. Then, in June 2005, what seemed to be a distant threat became a reality for the DOC when a Pennsylvania inmate filed a fraudulent lien against

---

[11]See, e.g., United States v. Joiner, 418 F.3d 863 (8th Cir. 2005) (affirming judgment of conviction against defendant-inmates for conspiracy to injure judicial officers in their property through the filing of UCC liens); United States v. Getzschman, 81 Fed.Appx. 619 (8th Cir. 2003) (affirming judgment of conviction, pursuant to federal statute prohibiting production of false or fictitious financial instruments, against defendant-inmates for conspiring to pass or file fictitious sight drafts under "redemption" scheme); United States v. Speight, 75 Fed.Appx. 802 (2d Cir. 2003) (affirming judgment of conviction for mail fraud against defendant-inmates for filing fraudulent liens against federal prosecutor and federal judge); United States v. Boos, No. 97-6329, 1999 WL 12741 (10th Cir. Jan. 14, 1999) (affirming judgment of conviction against defendants for filing retaliatory false liens against IRS agents who tried to collect taxes).

18

a state court judge and two DOC officials, including one of the defendants in this action. In particular, DOC officials were alarmed by this inmate's prediction that "Soon the D.O.C. will have 100's of people filing. It's coming, and it can't be stopped."

Plaintiffs argue that the DOC's confiscation of their materials was unreasonable, because even though they have possessed the contraband materials for some time, none of the plaintiffs was ever, or intended to be, involved with the filing of these bogus liens against judges, prosecutors or other government officials. However, their argument is belied by the fact that the August 2005 searches and seizures produced partially completed financing statement forms. Additionally, in the affidavits produced in this litigation, some of the plaintiffs assert that they have a legal right to make these fraudulent filings and to copyright their names. Moreover, in light of the DOC's experience with the inmate's June 2005 filing, which demonstrated that fraudulent UCC filings are easy to file but burdensome to remove, along with the research that informed their judgment on this policy, we conclude that the defendants' decision to engage in preemptive action in this case was reasonable and within their "broad discretion." See Shaw, 532 U.S. at 232. Accordingly, we agree with the District Court that, under the Turner threshold inquiry, the defendants have shown that the DOC policy and the August 2005 confiscation of plaintiffs' materials were reasonably related to their interest in protecting government officials from fraudulent liens. Jones, 461 F.3d at 360.

19

Next, we must evaluate whether the plaintiffs have any alternate means of exercising their First Amendment rights. Id. We must expansively view the right at issue as concerning the right to possess publications and legal materials in general, and not these publications in particular. See Thornburgh v. Abbott, 490 U.S. 401, 418 (1989). In that light, we observe that the plaintiffs still have available to them a wide range of legal materials and publications that do not pertain to the filing of fraudulent liens. Moreover, although DOC officials confiscated all of the plaintiffs' materials, they granted them a chance to retrieve their non-contraband publications and legal documents – an opportunity most of them declined. Thus, we agree that the plaintiffs retain a broad First Amendment right to view and possess First Amendment materials.

Under the third Turner factor, we consider the impact of accommodating the plaintiffs' asserted right to possess the contraband on guards, other inmates, and the allocation of prisoner resources generally. Jones, 461 F.3d at 360. Defendants argue, and we agree, that accommodating the plaintiffs' right to possess these materials may encourage them to harass, intimidate or threaten prison officials, including guards and administrators, by threatening to file liens. The DOC's experience with its inmate's June 2005 filing against Secretary Beard is instructive: As the record reveals, although the DOC sought to expunge the lien and the Pennsylvania Department of State issued adjudications declaring the financing statements fraudulent, the inmate has appealed both

20

adjudications. Presumably, the DOC's needless expenditure of resources on this event continues. This incident demonstrates the considerable "ripple effect" that accommodating the plaintiffs' right to possess these items might have on DOC resources and on guards and DOC employees if other inmates were to successfully file false liens.

Finally, as to whether there are alternatives to the regulation, the plaintiffs argue that the defendants should have waited until one of the plaintiffs filed a lien before taking action. That assertion ignores the June 2005 DOC inmate filing. Morever, prison administrators are not required to use the "least restrictive means" possible to further legitimate penological interests. See Thornburgh, 490 U.S. at 411. Additionally, we reiterate the unique problem that these fraudulent financing statements pose: Although the perpetrator can file the lien with relative ease, the victim must go through a complicated ordeal, such as to seek judicial action, in order to remove the lien. A court order to expunge the lien does not end the ordeal, as oftentimes the victim must then resolve his credit report, which typically will have been damaged by the time he discovers that the lien was filed. In light of the considerable time and expense imposed by these UCC, redemption, and name "copyrighting" schemes, we agree that requiring the DOC to accommodate plaintiffs right by adopting a "wait and see" approach, rather than by the pre-emptive measures they employed in this case, would impose more than a "de minimis" cost to prison officials. See Jones, 461 F.3d at 360. Therefore, we agree that this final

21

factor cuts in favor of the defendants.

Because the plaintiffs have not satisfied their burden of showing that the defendants' confiscation of their publications and materials was constitutionally unreasonable, we conclude that the District Court properly granted summary judgment in favor of the defendants on this claim.

## B.  Due Process

The plaintiffs argue that prison officials violated their Due Process rights by failing to afford them pre-deprivation hearings before confiscating legal and other personal materials. Moreover, they maintain that Due Process entitled them to notice that the materials at issue had been deemed to be contraband.  Finally, they challenge the sufficiency of the DOC's post-deprivation procedure on the grounds that the defendants have not adhered to their own grievance procedure (DC-ADM 804).

Like other constitutional rights, the Due Process rights of prisoners may be accommodated to a prison's legitimate security needs.  See Bell v. Wolfish, 441 U.S. 520, 558-60 (1979). "[A]n unauthorized intentional deprivation of property" by prison officials does not violate the Due Process Clause "if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984)(citing Parratt v. Taylor, 451 U.S. 527 (1981)).  Pre-deprivation notice is not constitutionally required. See id.

Because prisons are constitutionally required to afford inmates only a post-deprivation remedy, we agree that the defendants' failure to give the inmates prior notice of their intended seizure of their materials notice did not violate the plaintiffs' Due Process rights. Id. We also agree that the DOC furnished the plaintiffs with a meaningful post-deprivation remedy. After prison officers raided plaintiffs' cells and confiscated their materials, Deputy Superintendent for Internal Security Michael Lorenzo distributed a letter to the inmates setting forth the DOC's newly developed policy on "publications, UCC filings, the redemption process, UCC forms and tax forms used to file fraudulent liens." The letter further explained why the inmates' materials were confiscated and assured that non-contraband materials would be returned. Additionally, it informed them that the DOC's usual grievance procedure was available to them, and it set forth a special process for objecting to the seizures, explaining that an "Unacceptable Correspondence Form," or "Confiscated Items Report" should be used to file objections to the search and to give a legitimate reason for possessing the contraband items.

Although the plaintiffs allege that the defendants have not adhered to their own procedure, they have not shown that this post-deprivation procedure was not meaningful. Instead, the record shows that the defendants gave plaintiffs three opportunities (one by court order) to review materials and receive back approved, non-contraband items. And, as the Deputy Superintendent's letter evidences, the plaintiffs had a

23

chance to give a legitimate, non-contraband reason for possessing the UCC materials. Moreover, each of the inmates met individually with Lieutenant John Moyer. Although a few of the inmates received back non-contraband property, all of plaintiffs patently refused to review or receive back those materials. The plaintiffs do not refute that they received this post-deprivation process and, in fact, they admit in their appellate briefs that they have refused to accept back the non-contraband materials.[12] Finally, although the plaintiffs accuse the defendants of having destroyed their materials, they do not support this contention. Instead, the record reflects that the materials remain securely stored in at SCI-Graterford's Internal Security Office.

Given their failure to oppose the defendants assertion that they received a meaningful post-deprivation remedy, and because the record supports that finding, we conclude that the District Court correctly granted summary judgment on this claim.

---

[12]As the plaintiffs state in their Appellate Reply Brief: "If appellant(s) would have accepted one item back from appelles [sic] then appellees could argue that they returned the missing items to appellant(s). But by appellant(s) refusing appellee's offer (according to appellees) appellees cannot argue that the missing items were given back to appellants."

## V.  Miscellaneous Claims

Finally, the plaintiffs argue that they are "unwilling victims of Pennsylvania's captive inmate market," and that their continued imprisonment within the DOC violates the Commerce Clause and the Anti-Peonage Act.  These arguments are plainly meritless.  Having considered all of the plaintiffs' arguments, we conclude that they are without merit, and, therefore, we will affirm the District Court's judgment.  Plaintiffs' motion for a preliminary injunction and request for mandamus relief are denied.[13]

---

[13]Additionally, the plaintiffs suggest that Judge Stengel, who presided over this case in the District Court, exhibited bias in favor of defendants.  However, plaintiffs do not argue, and we find no evidence, that Judge Stengel actually exhibited bias against plaintiffs or displayed any appearance of partiality in this case.  Accordingly, the plaintiffs' request that we order Judge Stengel to recuse himself is denied.

25