

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-25-2003

# Nasir v. Morgan

Precedential or Non-Precedential: Precedential

Docket No. 01-2519

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Nasir v. Morgan" (2003). *2003 Decisions.* Paper 73.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/73

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 25, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2519

ABDUL NASIR

Appellant,

v.

CAPTAIN JAMES MORGAN; SUPERINTENDENT TIMOTHY
B. ENGLISH; THOMAS ALTMAN, MAIL ROOM
SUPERVISOR

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(W.D. PA. CIV. NO. 99-CV-00791)
District Judge: The Honorable Alan N. Bloch

Argued July 9, 2003

BEFORE: NYGAARD and SMITH, *Circuit Judges* and
IRENAS,* *Senior District Judge.*

(Filed: November 25, 2003)

Paul W. Schmidt, Esq. (Argued)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004
*Counsel for Appellant*

---

* Honorable Joseph E. Irenas, Senior District Judge for the United States
District Court for the District of New Jersey, sitting by designation.

Calvin R. Koons, Esq. (Argued)
Office of Attorney General of
  Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, PA 17120

Robert S. Englesberg, Esq.
Office of Attorney General of
  Pennsylvania
564 Forbes Avenue, 5th Floor
Manor Complex
Pittsburgh, PA 15219
  *Counsel for Appellee*

---

## OPINION OF THE COURT

---

IRENAS, *Senior District Judge*:

Presently before the Court is Appellant Abdul Nasir's ("Appellant," "Nasir") appeal of the Judgment entered by the United States District Court for the Western District of Pennsylvania, finding that Appellees Captain James Morgan ("Captain Morgan"), Superintendent Timothy B. English and Mail Room Supervisor Thomas Altman did not violate Nasir's constitutional rights under 42 U.S.C. § 1983. Specifically, Nasir argues that: (1) Appellees violated the First Amendment by banning correspondence between Nasir and former prisoner Jason Shutt ("Shutt"); and (2) Appellees violated Shutt's Fourteenth Amendment due process rights by failing to inform him of the ban on correspondence.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. This court has jurisdiction pursuant to 28 U.S.C. § 1291. Our standard of review applicable to an order granting summary judgment is plenary. *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). In conducting our review, we view the facts in the light most favorable to the non-moving party. *Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001). We affirm the judgment of the District Court, though on different grounds. We may affirm a District Court's summary judgment ruling on different

grounds, "provided the issue which forms the basis for our decision was before the lower court." *Morse v. Lower Merion School District,* 132 F.3d 90, 904 n.1 (3d Cir. 1998); *see also Salley v. Circuit City Stores, Inc.,* 160 F.3d 977, 978 (3d Cir. 1998).

# I.

In 1999, while an inmate in the State Correctional Institution at Greensburg, Pennsylvania ("Greensburg"), Abdul Nasir attempted to correspond by letter with Jason Shutt, a former inmate with whom Nasir had formed a romantic relationship. Appellants, who are officials at Greensburg, blocked this correspondence based on Pennsylvania Department of Corrections Policy Statement DC-ADM 803 ("Policy Statement"), which prohibits correspondence between current and former inmates.[1]

On April 22, 1999, one week after Shutt was released from Greensburg, Captain Morgan began monitoring Nasir's correspondence. Nasir was expressly ordered to stop all communications with Shutt on May 4, 1999. The following day, Morgan discovered mail which he believed Nasir was attempting to send to Shutt, and filed a report that resulted in Nasir receiving ninety days of disciplinary confinement. On May 7, 1999, Nasir's cell was searched to determine whether he was complying with the Policy Statement and a number of different items were seized as a result. Though Nasir contends that none of the seized items bore any

---

1. Pennsylvania Department of Corrections Policy Statement DC-ADM 803 and subsection VI (A)(3)(a) reads, in relevant part:

It is the written policy of the Department of Corrections to provide inmate access to communication with members of society at large through the established public mail system and to govern the inspection of mail, determine the types of publications allowed, and how they will be reviewed. Restriction to access shall be related directly to institutional order and obscenity criterion. . .

3.  Inmates are prohibited from:

(a) Corresponding with inmates, former inmates, parolees, probationers, co-defendants, or victims of the inmate's criminal acts except with the written approval of the Superintendent.

relationship to Shutt, he received another ninety days of disciplinary confinement based on the search.

The Greensburg mail logs show that during the relevant period, the prison confiscated eight pieces of mail that had been sent to or from Shutt. Five letters were from Shutt or Shutt's address, and three were either to Shutt, his address, or to Nasir's brother with an enclosed letter to be forwarded to Shutt. Nasir is now incarcerated at a state facility in Huntingdon, Pennsylvania, where he is still subject to the Policy Statement.

Nasir filed suit in the United States District Court for the Western District of Pennsylvania on May 21, 1999, claiming violations of his constitutional rights under 42 U.S.C. § 1983; specifically, that Appellees violated the free speech provisions of the First Amendment and the due process protections of the Fourteenth Amendment in blocking any correspondence to and from Shutt. The District Court granted Defendants' summary judgment motion.[2]

On June 13, 2001, Nasir appealed to this Court. On May 31, 2002, a panel of this Court dismissed part of Nasir's appeal, but held the appeal to be non-frivolous as to two issues: (1) whether the Pennsylvania Department of Corrections' prohibition on correspondence between inmates and former inmates is constitutional; and (2) whether defendants properly notified Jason Shutt when his letters to Appellant were rejected, whether Appellant has standing to bring an action based on this failure, and if so, whether Appellant's due process rights were violated.

---

2. The matter was referred to a Magistrate Judge who issued a Report and Recommendation on May 17, 2001. *See* Appellant's Appendix A 12. As to incoming mail the Judge said ". . . it is clear that DOC's administrative directive is reasonably related to DOC's legitimate concern for institutional security." Appellant's Appendix A 19. As to outgoing mail the Judge said that the directive ". . . furthered an important or substantial governmental interest unrelated to the suppression of expression, i.e., security, . . . ." Appellant's Appendix A 20. This Report and Recommendation was adopted as the opinion of the District Court on June 6, 2001. Appellant's Appendix A 10.

## II.

We do not find that Pennsylvania Department of Corrections Policy Statement DC-ADM 803 violates the First Amendment.[3] To reach this conclusion, we rely on two Supreme Court cases, *Turner v. Safley*, 482 U.S. 78 (1987) and *Procunier v. Martinez*, 416 U.S. 396, (1974), as the standards governing incoming and outgoing mail. We then determine that the Policy Statement passes both tests: (1) the four-part *Turner* test as to incoming mail and (2) the two-part *Martinez* test as to outgoing mail.

## A.

We begin, as did the Supreme Court in *Martinez* and *Turner*, by noting that federal courts must heed the valid constitutional claims of prison inmates. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. Because prisoners retain their constitutional rights, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Martinez*, 416 U.S. at 405-06. However, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning," and regulations to guarantee prison and inmate security. *Turner,* 482 U.S. at 84. Prisoner mail is one such area in which inmate behavior is regulated.

The Court's original decision in the field of prisoner mail was *Martinez*, which in effect applies a strict scrutiny test to all restrictions on prisoner correspondence.[4] However, in

---

3. We have permitted the Appellant prisoner in this case to raise the First Amendment rights of the former prisoner whose First Amendment rights are also impinged by the ban on correspondence. *Martinez* suggests that a total ban on correspondence between two people implicates the First Amendment rights of both in a way that is inextricably intertwined. 416 U.S. 396, 408-09 (1974).

4. Although the *Martinez* Court never used the words 'strict scrutiny,' subsequent Supreme Court cases refer to *Martinez* as applying strict scrutiny. *See Turner*, 482 U.S. at 83. Nevertheless, Justice Blackmun, in *Thornburgh v. Abbott* declined to recognize *Martinez* as calling for a least-restrictive means test, the hallmark of strict scrutiny analysis. 490 U.S. 401, 411 (1989).

*Turner*, the Court retreated from the *Martinez* test and outlined a more deferential standard — one that the Court and the Third Circuit have since followed consistently in prisoners' constitutional rights cases. However, in a 1989 Supreme Court case, *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989), Justice Blackmun suggested that *Turner* had not overruled the *Martinez* two-part test as applied in cases concerning outgoing mail.

*Martinez* concerned a California Department of Corrections regulation which censored inmate mail deemed to magnify grievances or contain other inflammatory statements. 416 U.S. at 316. In finding the regulation unconstitutional, the Court originally set forth a two-part test:

> First, the regulation or practice in question must further an important or substantial government interest unrelated to the suppression of expression. Prison officials must show that a regulation authorizing censorship furthers one or more of the substantial government interests of security, order and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

*Martinez*, 416 U.S. at 413.

The *Martinez* test stood alone in the Court's discussion of prisoner mail until the *Turner* case thirteen years later. *Turner* considered a Missouri prison regulation that forbade communication between inmates at different institutions. The Court upheld the regulation, and in doing so, laid down a different standard and test than that in *Martinez*. It wrote: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

Since the *Turner* decision, the Supreme Court has consistently applied the *Turner* standard to prisoners' constitutional rights claims. *See Shaw v. Murphy*, 532 U.S. 223 (2001), (considering a ban on inmate-to-inmate correspondence that contained legal advice); *Washington v.*

*Harper,* 494 U.S. 210 (1990) (applying *Turner* to a substantive due process challenge to the involuntary administration of psychotropic drugs to a prisoner who had a serious mental illness); *O'Lone v. Shabazz,* 428 U.S. 342 (1987), (upholding the constitutionality on First Amendment grounds of a prison policy that prevented Muslim inmates from attending a weekly congregational service). The Third Circuit has similarly recognized *Turner* as the applicable standard in prisoners' constitutional rights cases. *See, e.g., Doe v. Delie,* 257 F.3d 309 (3d Cir. 2001); *DeHart v. Horn,* 227 F.3d 47 (3d Cir. 2000) (*en banc*); *Abu-Jamal v. Price,* 154 F.3d 128 (3d Cir. 1998); *Reynolds v. Wagner,* 128 F.3d 166 (3d Cir. 1997); *Cooper v. Tard,* 855 F.2d 125 (3d Cir. 1988).

Nevertheless, in *Thornburgh v. Abbott,* 490 U.S. 401 (D.C. Cir. 1989), the Supreme Court narrowly construed *Turner*'s impact on *Martinez. Thornburgh* involved a challenge, on First Amendment grounds, to a District of Columbia prison regulation governing receipt of subscription publications. The Court actually applied *Turner* and upheld the regulation. In doing so the Court limited *Martinez*:

> [A] careful reading of *Martinez* suggests that our rejection of the regulation at issue resulted not from a least restrictive means requirement, but from our recognition that the regulated activity centrally at issue in that case — outgoing personal correspondence from prisoners — did not, by its very nature, pose a serious threat to prison security. . .

> Furthermore, we acknowledge today that the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence. . . The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.

*Id.* at 411-13. *Thornburgh* was, in effect, giving *Turner* and *Martinez* narrow readings to minimize the conflict between the two cases. However, *Thornburgh* was a case about incoming mail. The Court made no judgment as to outgoing mail, and any suggestion by the Court that *Martinez* would

still apply to outgoing mail was dictum. We note that *Thornburgh* refused to apply different standards to incoming mail from prisoners as opposed to incoming mail from non-prisoners, notwithstanding the argument that incoming mail from prisoners is potentially much more dangerous.[5] 490 U.S. at 413. Because *Thornburgh* holds that *Turner* does not squarely overrule *Martinez* as applied to outgoing mail, we will apply *Turner* to incoming mail and *Martinez* to outgoing correspondence.

**B.**

Applying the *Turner* standard to incoming mail, we find the Policy Statement reasonably related to legitimate penological interests. To reach this determination, *Turner* prescribes a four-part test. We must consider: (1) whether there is a valid, rational connection between the prison regulation and a legitimate governmental interest; (2) whether alternative means of exercising the right in question remain open to inmates; (3) the impact accommodation of the asserted prisoner right will have on the prison generally; and (4) whether there is an absence of ready alternatives. *Turner*, 482 at 89-90. We consider each factor of the analysis in turn.

**1.**

The first, and most important, prong of the *Turner* analysis requires a rational connection between the prison regulation in question and the legitimate governmental interest which justifies it. According to *Turner*, a regulation will be sustained unless, "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id*. There is no

---

5. The Magistrate Judge applied *Turner* to both incoming and outgoing mail. He appeared to reason that since *Thornburgh* declined to adopt a different standard for incoming mail from prisoners as compared to incoming mail from non-prisoners, correspondence between prisoners, which is subject to *Turner*, should be treated no differently than mail between a prisoner and a non-prisoner. *See* Appellant's Appendix A 18-19. The fallacy in this logic is that from an institutional perspective prisoner to prisoner mail is all incoming mail.

question that such a connection exists in this case with respect to incoming mail. The Policy Statement is rationally connected to a legitimate government interest: insuring the internal and external safety of prisons.

The regulation and the asserted goal in this case are very similar to those at stake in *Turner.* As the *Turner* Court noted, inmate to inmate mail between institutions "can be used to communicate escape plans and to arrange assaults and other violent acts." *Id.* at 91. These concerns hardly change when the sender of prisoner correspondence is a former prisoner. Indeed, they may increase as the former prisoner has greater access to people and items that could lead to crimes outside or inside the prison. *See O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996) (holding that a prisoner could have an outside confederate send mail that threatens prison security under the guise of a response to a grievance).

The concerns that the Policy Statement addresses are undeniably legitimate, and the Statement is squarely aimed at those concerns; thus, it passes the first element of the *Turner* test.

**2.**

The second *Turner* factor considers whether there are "alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 89. The right at stake here is communication with individuals outside the prison, and we find that ample alternative means to communicate remain open to prison inmates under the Policy Statement. Once again, the factual similarities between this case and *Turner* provide guidance:

> Moreover, the correspondence regulation [between inmates at different institutions] does not deprive prisoners of all means of expression. Rather, it bars communication only with a limited class of other people with whom prison officials have particular cause to be concerned — inmates at other institutions within the Missouri prison system.

*Id.* at 92.

Here, the challenged Policy Statement, as in *Turner*, does not bar prisoners from all forms of correspondence. At issue here is "communication with a limited class of other people with whom prison officials" are concerned: former prisoners. *Id.* Outside of this limited class, prisoners are free to communicate with most any other individual. In fact, the inmate censoring log shows that of 32 pieces of mail Appellant sent out during the relevant 30 day period, 24 were forwarded to their intended recipient, evidencing quite an ample opportunity to communicate with non-prisoners. Thus, The Policy Statement passes the second element of the *Turner* test.

**3.**

The third factor in the *Turner* analysis of incoming mail is the impact of accommodating the asserted right on other inmates and prison personnel. We find that communication with former prisoners has a significant potential negative impact on the rights of other inmates and prison personnel; an impact sufficient to justify imposing limits on that communication.

As stated in *Turner*, where a right "can be exercised only at the cost of significantly less liberty and safety for everyone else . . . the choice made by corrections officials . . . should not be lightly set aside by the courts." *Id.* The Court found that the correspondence between inmates at separate prison institutions, "facilitates the development of informal organizations that threaten the core functions of prison administration, maintaining safety and internal security . . . at the cost of significantly less liberty and safety for everyone else, guards and prisoners alike." *Id.*

As the regulation here concerns communications with former prisoners, the concern of 'informal organization development' may be less pronounced, but it is replaced with new risks including escape, retaliation, introduction of contraband, and other illegal activity. There are considerable grounds to determine that allowing unsupervised communication to former prisoners could harm prisoners, guards, and the prison system generally. Therefore, the Policy Statement passes the third *Turner* element.

## 4.

Finally, the fourth *Turner* element evaluates the availability of ready alternatives to the regulation in question. If there are clear alternatives available, the regulation is less likely to be upheld. The only alternative that Appellant Nasir proposes in this case, just as the plaintiffs argued in *Turner*, is the complete monitoring of inmate correspondence to prevent all dangerous communication. The *Turner* response is equally appropriate here: "Prison officials testified that it would be impossible to read every piece of inmate-to-inmate correspondence, and consequently there would be an appreciable risk of missing dangerous messages." *Id.* at 93.

Further, the *Turner* Court recognizes the real possibility that prisoners develop jargon or code to "prevent detection of their real messages." *Id.* We need only recall Holly Golightly's weekly visits to Sing-Sing to see mobster Sally Tomato and her unwitting communication of his "weather reports" to an outside confederate to note the ease with which this can be accomplished.[6]

---

6. The relevant stretch of dialogue between Audrey Hepburn and George Peppard from BREAKFAST AT TIFFANY'S (Paramount Pictures 1961) reads:

*Paul Varjak*: "And what do you mean, weather report?"

*Holly Golightly*: "Just a message I give Mr. O'Shaughnessy so he knows I've really been up there. Sally tells me to say things like, uh . . . oh, there's a hurricane over in Cuba . . . or, cloudy over Palermo, things like that."

[Break]

*Paul Varjak*: "Now, darling, why don't you start? Did you carry messages from Sally Tomato in code?"

*Holly Golightly*: "Of course not. I'd just give Mr. O'Shaughnessy the weather report. Simply do not ask me what this is all about."

*Paul Varjak*: "Did you visit Tomato?"

*Holly Golightly*: "Every week. What's wrong with that?"

*Paul Varjak*: "Tomato's part of the narcotics syndicate."

*Holly Golightly*: "He never mentioned narcotics. These wretched people keep persecuting him. He's a deeply sensitive person, a darling old man."

BREAKFAST AT TIFFANY'S (Paramount Pictures 1961).

Because there would be an inherent risk of missing dangerous communications, both through the use of deceptive language and due to the volume of incoming mail that prison staff would be required to read and review, we do not feel that Appellant Nasir presents a reasonable alternative to the Policy Statement. Therefore, we find that the regulation passes the fourth element of the *Turner* test.[7]

With respect to incoming mail, the Policy Statement is reasonably related to legitimate penological objectives. Incoming communication to inmates by former prisoners presents a serious set of dangers to prison safety and prison administration, and the regulation logically addresses those dangers by permitting correspondence only with approval. Accordingly, we conclude that the regulation does not unconstitutionally abridge Appellant Nasir's First Amendment rights.

## C.

Having determined that the Policy Statement does not violate the First Amendment with respect to incoming mail, we must now determine whether the same holds true for outgoing mail. The applicable test from *Martinez* has two elements: (1) that the regulation must further an important or substantial government interest unrelated to the suppression of expression; and (2) that the regulation be no greater than necessary for the protection of that interest. *Martinez*, 416 U.S. at 413. We find that the Policy Statement passes both elements of the *Martinez* test.

## 1.

The Policy Statement clearly furthers an important and substantial government interest unrelated to the suppression of expression. The Policy Statement is aimed at maintaining the internal security of prisons and deterring violent or otherwise dangerous behavior outside of prison.

7. Most prisons also forbid inmates from playing correspondence chess with either inmates in other institutions or with outsiders. The symbols used to convey the next move may conceal a code being used for nefarious purposes.

In *Martinez*, the Court gave some guidance as to what criteria would satisfy the first element of its analysis. "Prison officials must show that a regulation authorizing censorship furthers one or more of the substantial government interests of security, order and rehabilitation." *Id.* While as a general rule the Supreme Court considers outgoing mail less risky than incoming correspondence, *Thornburgh* recognizes that there may still be considerable danger in outgoing letters:

> The implications [of outgoing correspondence] for [prison] security are far more predictable. Dangerous outgoing correspondence is more likely to fall within readily identifiable categories: examples . . . include escape plans, plans relating to ongoing criminal activity, and threats of blackmail or extortion.

490 U.S. at 413. Added to these risks are the possibility that such mail could be used to facilitate the introduction of contraband into the prison, or the conducting of a business prohibited by prison regulations. The specific threats to security identified by *Thornburgh* constitute an important and substantial government interest.

Outgoing inmate correspondence addressed to former inmates rather alarmingly implicates the *Thornburgh* concerns. Former inmates of an institution have an intimate knowledge of its internal functions and residents. The threat from correspondence on these issues — escape, contraband, retaliation, violence, illegal business operation — is intensely magnified when the communication is with a former inmate.

The criminal justice system recognizes the dangers of communicating with former felons outside the prison context as well. The *Turner* Court also noted: "Undoubtedly, communication with other felons is a potential spur to criminal behavior: this sort of contact is frequently prohibited even after an inmate has been released on parole." *Turner*, 482 U.S. at 92. Clearly, if a parole officer must grant permission to a parolee to communicate with a former prisoner, a prison is entitled to the same supervision over the same communications of a *current* prisoner. *See, e.g.,* USSG § 5D1.3 (c)(9) (stating that defendants on

supervised release shall not associate with convicted felons without permission of probation officer); 28 CFR § 2.40 (a)(10) (conditioning federal parole on non-association with known criminals, unless permission is granted by the parole officer); 28 CFR § 2.204; 18 USC § 3583 (d); 18 USC § 3563 (b)(6).

In *Overton v. Bazzetta*, 123 S. Ct. 2162 (2003), the Supreme Court recently considered a variety of restrictions on visitation imposed by the Michigan Department of Corrections, one of which forbids an inmate from placing a former prisoner on his list of approved visitors, unless that inmate was also a part of the inmate's immediate family. Mich. Admin. Code Rule 791.6609(7). *Id.* at 2166. In reversing the District Court and the Sixth Circuit Court of Appeals, both of which found the regulation unconstitutional, the Court quoted from *Turner* at 91-92: "We have recognized that 'communications with other felons is a potential spur to criminal behavior.'" *Id.* at 2168. The risks inherent in visits between a prisoner and a former inmate seem little different from the risks which flow from written communications between a prisoner and a former inmate.

Outgoing inmate correspondence to former prisoners deals with those institutional dangers specifically identified in *Thornburgh*. Maintaining prison security in the face of that correspondence is the goal of the Policy Statement, and therefore, even under the *Martinez* standard, we find that the Statement furthers an important and substantial government interest.

## 2.

The second element of the *Martinez* analysis, that the limitation of First Amendment freedoms be no greater than necessary or essential to the protection of the particular governmental interest involved, is also satisfied.

We point out first that this is not a least-restrictive means test. "We do not believe that *Martinez* should, or need, be read as subjecting the decisions of prison officials to a least-restrictive means test." *Thornburgh*, 490 U.S. at 411. Much of the discussion, therefore, that proceeded in

the *Turner* analysis is relevant here. The Policy Statement is not a ban on all inmate correspondence, nor does it even represent a majority of such correspondence. The ban is narrowly tailored, aimed only at correspondence with former prisoners. Ample opportunity still exists for prisoners to communicate with the outside. Appellant Nasir himself only had 8 of 32 pieces of mail blocked during a 30-day period. Further, the Policy Statement does not provide a categorical ban on correspondence with former inmates. Rather, the correspondence may be allowed, "with written approval of the Superintendent." Pennsylvania Department of Corrections Policy Statement DC-ADM 803. And as the *Martinez* Court noted, "some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty."

We believe that the Policy Statement falls squarely into that category: a narrowly-tailored, specific regulation that extends a proper amount of discretion to prison officials. Such regulations are necessary if, " 'prison administrators . . . and not the courts, [are] to make the difficult judgments concerning institutional operations.' " *Turner*, 482 U.S. at 89, (*quoting Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 128 (1977)).

We find that Pennsylvania Department of Corrections Policy Statement DC-ADM 803 is constitutional as to its regulation of outgoing mail. The Policy Statement furthers an important and substantial government interest unrelated to the suppression of expression and the limitation it imposes on First Amendment freedoms is no greater than necessary or essential to the protection of the particular governmental interest involved.

## III.

Finally, we turn briefly to Appellant Nasir's Fourteenth Amendment due process claim on behalf of Mr. Shutt. Nasir argues that Shutt's rights were violated when Appellees failed to notify Shutt that their correspondence was being blocked.

We determine the appropriateness of third-party standing with a three element test. *See Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*, 280 F.3d 278, 288-89 (3d. Cir) (*quoting Campbell v. Louisiana*, 523 U.S. 392, 397, (1998)). To successfully assert third-party standing: (1) the plaintiff must suffer injury; (2) the plaintiff and the third party must have a 'close relationship'; and (3) the third party must face some obstacles that prevent it from pursuing its own claims.

We agree that Nasir has suffered an injury in this case as his mail did not reach Mr. Shutt, and that the third party faced a reasonable obstacle, as Mr. Shutt was never made aware of the mail he was not receiving. However, Nasir cannot satisfy the second element of the test — a 'close' relationship with Shutt.

Nasir argues that he and Shutt had a 'close' relationship because Shutt was the direct recipient of his mail. Nasir also asserts that his romantic relationship validates the 'close' relationship. However, both grounds mischaracterize the nature of the third-party standing connection. Though courts have recognized a reasonable number of relationships that give rise to third-party standing, mere correspondence is not one of them. In *Green Spring*, the court listed several relationships as close: doctor/patient, lawyer/client or vendor/customer. *Id.* at 290. Mail sender/mail recipient was not among those listed, nor should it have been.

A 'close' relationship for third-party standing must allow the third-party plaintiff to operate "fully, or very nearly, as effective a proponent," of the potential plaintiff's rights as would the plaintiff himself. *Id.* Such a situation arises, as described above, in professional contexts, where the rights of the potential plaintiff and third-party plaintiff neatly align. Here we deal with a current inmate and a former inmate — individuals unconnected by any professional tie, and with very different sets of rights. Therefore, we do not find that a relationship of correspondence, even romantic, gives rise to third-party standing, and we deny Appellant Nasir's ability to raise a due process claim on behalf of Shutt.

## IV.

In conclusion, we find Pennsylvania Department of Corrections Policy Statement DC-ADM 803 constitutional. The Policy Statement does not violate the First Amendment with respect to incoming mail or outgoing mail, as it passes the tests set out in *Procunier v. Martinez* and *Turner v. Safley*. We also conclude that Appellant Nasir does not have a sufficiently close relationship to Mr. Shutt to confer the standing necessary for Nasir to bring a due process claim on Shutt's behalf. Courts have long held a policy of deference to those with experience and expertise in the realm of prison administration.[8] We have no basis to upset that notion here. We affirm the judgment of the district court.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*

---

8. The issue in this case is the harm that current prisoner/former prisoner correspondence can do to prison security — not an area, as noted in *Waterman v. Farmer*, "fraught with . . . scientific uncertainties." 183 F.3d 208, 217 (3d Cir. 1999) (considering a regulation banning the introduction of sexually explicit materials into a prison). Prisoner mail is an area that the courts have encountered before, in which the dangers are clear and recognized. *Thornburgh*, 490 U.S. at 413. In fact, on matters that rely so heavily on the expertise and experience of prison officials, courts have counseled significant judicial restraint: "[w]here a state penal system is involved federal courts have, as we indicated in *Martinez*, additional reason to accord deference to the appropriate prison authorities." *Turner,* 482 U.S. at 84-85. Due to the lack of scientific uncertainty and the frequency and clarity with which courts have in the past found appreciable risk in felon to felon contacts, we hold that a remand to the District Court is not required. Just recently, in *Overton,* the Supreme Court described as "self-evident" the connection between "maintaining prison security and preventing future crimes" and a "regulation prohibiting visitation by former inmates." *Id.* at 2168.