

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-13-2009

# Fontroy v. Beard

Precedential or Non-Precedential: Precedential

Docket No. 07-2446

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Fontroy v. Beard" (2009). *2009 Decisions.* Paper 1626.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1626

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-2446
_____

DERRICK DALE FONTROY, I;
THEODORE B. SAVAGE, J.D.;
AARON CHRISTOPHER WHEELER;

v.

JEFFREY A. BEARD;
DAVID DIGUGLIELMO;
KIM ULISNY,

Appellants.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court  No. 02-cv-02949
District Judge: The Honorable Timothy J. Savage

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 27, 2009


1

Before: SCIRICA, *Chief Judge,* AMBRO, and SMITH,
*Circuit Judges*

(Filed: March 10, 2009 )

Claudia M. Tesoro
Office of the Attorney General
21 South 12th Street
Third Floor
Philadelphia, PA 19107
　　*Counsel for Appellants Jeffrey A. Beard, David
　　DiGuglielmo, and Kim Ulisny*

Derrick Dale Fontroy
Theodore B. Savage
Aaron Christopher Wheeler
　　*Proceeding Pro Se*

---

AMENDED  OPINION

---

SMITH, *Circuit Judge.*

　　In 2002, the Pennsylvania Department of Corrections
("DOC") implemented a new prison mail policy.  This policy
required attorneys and courts to affix "Control Numbers" to mail
sent to inmates before those communications would be

2

separated from regular mail, and opened and inspected for the first time in the addressee inmate's presence. Appellees Derrick Dale Fontroy, Theodore B. Savage, and Aaron Christopher Wheeler (the "Inmates") successfully challenged the constitutionality of this policy on First Amendment grounds in the District Court. Officials from the DOC have appealed. We are mindful that important First Amendment interests are at stake. But because we conclude that the new policy is "reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89 (1987), it passes constitutional muster, and we will reverse the District Court.

I.

To ensure that inmates cannot obtain contraband through the mail system, the DOC has policies for opening and inspecting incoming prison mail. The DOC receives mail addressed to inmates in mailrooms, which are located outside the perimeter of each corrections facility. There, the mail is x-rayed and sorted. Mail inspectors at these off-site facilities then open and inspect regular mail for contraband. Legal mail,[1] however, must be treated differently. Although the DOC prohibits mail inspectors from reading mail addressed to inmates except in special circumstances, constitutional obligations require the DOC to take additional measures to ensure that legal

---

[1] For the purposes of this opinion, we use the term "legal mail" to refer to incoming attorney and court mail, collectively.

mail remains unread. *See Jones v. Brown*, 461 F.3d 353, 355 (3d Cir. 2006) (holding that "state prisoners have an interest protected by the First Amendment in being present when their incoming legal mail is opened."); *see also Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995) ("[A] pattern and practice of opening properly marked incoming *court* mail outside an inmate's presence infringes communication protected by the right to free speech." (emphasis added)). A policy that allows the opening of legal mail without the physical presence of addressee inmates "deprives the expression of confidentiality and chills the inmates' protected expression, regardless of the state's good-faith protestations that it does not, and will not, read the content of the communications." *Jones*, 461 F.3d at 359. As a result, the DOC tries to separate legal mail from regular mail so that legal mail can be opened and inspected for the first time in the addressee inmate's presence. How the DOC distinguishes between legal and regular mail is at the heart of this dispute.

Under the DOC mail policy in place from the 1970s until 2002, DOC staff looked at the return address alone to determine whether the sender was an attorney or court. If the return address indicated that the mail originated from one of those sources, the mail was classified as a "Privileged Correspondence."[2] Privileged Correspondence was then

_____

[2]The designation "Privileged Correspondence" does not necessarily equate with legal privilege. The DOC's mail

4

separated from the regular mail, sent to the corrections facility, and opened and inspected for the first time by on-site Housing Unit Officers in the inmates' presence.

In 2002, the DOC decided to change its policies and procedures for handling and inspecting legal mail sent to inmates. Appellant Jeffrey Beard, the Secretary of the DOC, explained during a deposition that the DOC had "ongoing concerns about the privileged mail that was coming to our institutions, because on a not infrequent basis, and in virtually all of our institutions at one time or another, we have come across attempts by inmates to smuggle various items in what was considered to be privileged mail." Two reports prepared in 1999 evidenced those ongoing concerns. A November 1999 report analyzing the high-profile escape of an inmate (the "Escape Report") suggested that the hacksaw blade and security screwdriver the inmate used to escape were obtained through mail treated as Privileged Correspondence. Additionally, a September 1999 report entitled "Privileged Correspondence Inspection and Contraband" (the "September Report") contained a "random sampling of incidents involving legal mail abuse." The September Report advised the DOC to revise the existing mail inspection policies because 1) contraband contained in

policies define Privileged Correspondence as correspondence that meets specified conditions, and it has been limited to communications from attorneys, courts, and certain elected and appointed officials.

Privileged Correspondence would pass through corrections facility gates before it could be discovered; and 2) the inspection of Privileged Correspondence was less effective because Housing Unit Officers had less experience and time to devote to the task than the professional Corrections Mail Inspectors.

After negotiating proposed revisions with the American Civil Liberties Union, Pennsylvania Institutional Law Project, and the Defender Association of Philadelphia, the DOC issued a new mail policy on September 1, 2002, effective September 30, 2002. Under the new policy, incoming attorney communications could be treated as Privileged Correspondence only if they met one of two conditions: 1) the attorneys hand-delivered the sealed communications to specified DOC facilities; or 2) the attorneys obtained a Control Number from the DOC and placed the Control Number on each envelope mailed to an inmate. Attorneys could obtain a Control Number by faxing a letter request containing the attorney's name, address, telephone and fax numbers, state attorney identification number, and a written verification subject to the penalties of 18 Pa. Cons. Stat. § 4904[3] that all mail sent to inmates using the Control Number would contain "only essential confidential, attorney-client communication and [would] contain no contraband." The DOC must then provide the attorney with a

_____

[3]18 Pa. Cons. Stat. § 4904 describes certain misdemeanors associated with making unsworn false statements to authorities.

6

Control Number one business day after receiving a request.[4] A subsequent revision that was issued on May 20, 2004, effective July 15, 2004, made two relevant changes: the revision 1) allowed courts to obtain Control Numbers in the same manner as attorneys;[5] and 2) required all incoming mail that did not bear a Control Number but still appeared to be from a court to be hand-delivered after it was opened and inspected like other regular mail.

On May 16, 2002, the Inmates filed a *pro se* complaint against Appellants Beard, David DiGuglielmo, and Kim Ulisny (the "DOC Officials").[6] An Amended Complaint was filed on

---

[4]The American Civil Liberties Union Foundation of Pennsylvania approved of the DOC's plan to require Control Numbers on attorney mail in a letter dated June 25, 2002.

[5]A court seeking a Control Number faxes a letter request on official letterhead, signed by any judge or chief non-judicial officer of the court.

[6]Instead of DiGuglielmo, the complaint originally named Donald Vaughn as a defendant. At the time, Vaughn was the Superintendent at the DOC facility where the Inmates were incarcerated. DiGuglielmo, the facility's current Superintendent, replaced Vaughn as a party to this action on April 12, 2007.

January 29, 2003, followed by a blizzard of other submissions.[7] The Inmates alleged that the DOC's new mail policy unconstitutionally burdened their First Amendment rights. They claimed that attorneys and courts had not obtained Control Numbers, despite repeated requests, and as a result Corrections Mail Inspectors were opening and inspecting legitimate legal mail outside of the Inmates' presence. The Inmates sought both damages and injunctive relief.

Both parties filed motions for summary judgment. *Fontroy v. Beard*, 485 F. Supp. 2d 592, 593 (E.D. Pa. 2007).[8] On May 3, 2007, the District Court granted the Inmates' motion for summary judgment with respect to their request to enjoin the new mail policy's implementation, and denied the DOC Officials' corresponding cross-motion for summary judgment on that issue.[9] *Id*. at 601. The District Court determined that the

_____

[7]The able District Judge patiently managed this case, which now contains 350 docket entries.

[8]The DOC Officials filed a motion to dismiss the Amended Complaint on February 14, 2003. The Inmates then filed a motion for summary judgment on June 18, 2003. Subsequently, the District Court construed the DOC Officials' motion to dismiss the Amended Complaint as a cross-motion for summary judgment. *Fontroy*, 485 F. Supp. 2d at 593.

[9]The District Court also held that the DOC Officials were entitled to qualified immunity and that the DOC's decision to

DOC's new mail policy[10] unconstitutionally infringed on the Inmates' First Amendment rights because there was no "reasonable connection between the asserted legitimate penological interest and the mail regulation" as required by *Turner v. Safley*. *Id*. at 592–93. The Court believed that "[t]he connection between the policy change and the rationale for it [was] tenuous and remote," and characterized the changes as "an overreaction to a single escape incident and a few isolated violations of the contraband policy involving legal mail that may or may not have occurred." *Id*. at 599. Accordingly, the Court held that the new mail policy failed the first part of *Turner*'s two-step test: there was no rational relationship between the mail policy and the legitimate penological interest in prison safety and security. *Id*. In the alternative, the Court held that the new policy did not satisfy *Turner*'s second step, which is outlined below, and therefore would not have passed constitutional muster even if a rational connection had been established. *Id*.

After the District Court denied their motion to alter the

_____

stop keeping a mail log for court mail was constitutional. *Fontroy*, 485 F. Supp. 2d at 600–01. These determinations have not been raised on appeal.

[10]The Court addressed the most current DOC mail policy, which included the changes made in 2004 regarding the treatment of court mail. *Fontroy,*, 485 F. Supp. 2d at 593 n.1.

9

judgment, the DOC Officials filed a timely appeal challenging both the District Court's granting of the Inmates' motion for summary judgment and its denial of the DOC Officials' cross-motion for summary judgment.

## II.

The Inmates' underlying suit is actionable under 42 U.S.C. § 1983. Therefore, the District Court had jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's summary judgment decisions is plenary, but we must view the facts in the light most favorable to the non-moving party. *Nasir v. Morgan*, 350 F.3d 366, 368 (3d Cir. 2003).

## III.

We first address the District Court's grant of the Inmates' motion for summary judgment. The DOC Officials concede that the DOC's new mail policy impinges on the Inmates' First Amendment rights because at least some legal mail is opened and inspected outside of the Inmates' presence. *See Jones*, 461 F.3d at 359 (reaffirming that a policy "of opening legal mail outside the presence of the addressee inmate interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech"). The DOC Officials point out, however, that the policy can still be

10

constitutional under *Turner v. Safley* "if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

"Under the teachings of *Turner*, there are two steps to take in determining whether a prison regulation is 'reasonably related to legitimate penological interests.'" *Jones*, 461 F.3d at 360 (quoting *Turner*, 482 U.S. at 89). First, we must determine "whether there is a valid, rational connection between the prison regulation and the legitimate interest put forth to justify it." *Monroe v. Beard*, 536 F.3d 198, 207 (3d Cir. 2008) (internal quotations and citation omitted). We afford "substantial deference" to the DOC's professional judgment, but the DOC Officials' evidence "must amount to more than a conclusory assertion." *Id*. (internal quotations and citation omitted). Although the Inmates bear the ultimate burden of showing that the DOC's new mail policy is unconstitutional, it is the DOC Officials' burden to demonstrate that a rational connection exists between the policy and a legitimate penological interest. *Id*.

If this rational connection exists, we then consider three other factors in a second-step analysis: 1) whether inmates have an alternative means of exercising the right; 2) the burden on prison resources that would be imposed by accommodating the right; and 3) whether there are alternatives to the regulation that fully accommodate the inmate's rights at *de minimis* cost to valid penological objectives. *Id*. We do not, however, require prisons to use the least restrictive means possible to further legitimate penological interests. *Id*.

11

A.

Under *Turner*'s first step, we must determine whether the record supports a rational connection between improving the means of verifying the source of legal mail through the use of Control Numbers and the safety and security problems posed by inmates using the legal mail system to smuggle contraband.

We conclude that the DOC Officials have established the necessary rational connection here. First, the record provides ample support for the DOC's belief that its old legal mail policy was being abused. Beard testified at his deposition that "over the years we have had ongoing concerns about the privileged mail that was coming into our institutions." Ulisny, a mailroom supervisor with twenty-seven years of mailroom experience, testified at her deposition that she encountered instances where mail bearing return addresses from attorneys and courts contained contraband. The Escape Report stated that there was "[s]ubstantial evidence show[ing] that [an escaped inmate] was able to introduce contraband in the institution through 'legal mail.'" This included the materials suspected to have aided in the inmate's escape. The September Report included a random sample of about fifteen instances between 1986 to 1999 where the DOC recovered contraband from mail that appeared from its return address to be legal mail.

Second, the record shows that some of these abuses of the DOC's old mail policy involved the falsification of return

12

addresses in order to obtain treatment as Privileged Correspondence. Ulisny testified that she recalled one instance where contraband was discovered in an envelope fraudulently bearing an attorney's return address. The September Report's random sampling of legal mail abuses included at least two instances that involved the use of a fake return address from an attorney. Indeed, the Escape Report specifically pointed out that under the DOC's old mail policy, it was "difficult to confirm whether the mail was actually sent by an attorney, since legal envelopes have been stolen and misused by inmates and/or their associates."

Third, evidence suggests that prison security and safety is enhanced when off-site Corrections Mail Inspectors inspect more mail, and on-site Housing Unit Officers inspect less. The September Report identified two reasons for this effect: 1) off-site inspection kept contraband contained in mail from physically entering the corrections facility; and 2) the use of professional Corrections Mail Inspectors increased the likelihood that contraband would be discovered. The Escape Report echoed these findings. Accordingly, reducing the amount of fake legal mail erroneously treated as Privileged Correspondence would enhance prison security and safety.

For these reasons, we disagree with the District Court that "[t]he connection between the policy change and the rationale for it is tenuous and remote." *Fontroy*, 485 F. Supp. 2d at 599. Most clearly, the record undermines the District

13

Court's determination that "[t]he concerns articulated now by the DOC were not the reasons given for the policy change at the time," and "[t]he only rationale for the revision then was the prevention of escape." *Id*. at 598. To the contrary, the September Report's random sampling of instances of legal mail abuse, the Escape Report's specific reference to problems distinguishing between fake and legitimate legal mail, and Ulisny's testimony about legal mail abuses bolster Beard's testimony that the DOC had ongoing concerns about weaknesses in its legal mail system. Although the inmate's escape may have prompted the DOC to scrutinize its mail policies across penal institutions, the DOC certainly had evidence of ongoing and systematic abuses of the legal mail system, including evidence of the use of fake attorney return addresses. This shows that much more than just the prevention of escape motivated the DOC's new mail policy.

Any deficiencies in the Escape Report and the September Report that the District Court relied upon do not suggest otherwise. Although the Escape Report did not conclusively determine that the inmate's escape tools were smuggled into the prison through legal mail, this does not amount to a "fail[ure] to produce any evidence, let alone substantial evidence, linking the inmate's escape tools to legal mail." *Fontroy*, 485 F. Supp. 2d at 596. The Escape Report noted that, in 1998, the escaped inmate "was issued a misconduct for the possession of implements of escape and possession of a controlled substance, when marijuana and a security screwdriver tip were found in the

14

binding of a legal brief." Also, the Escape Report's conclusion that "[s]ubstantial evidence shows that [the escaped inmate] was able to introduce contraband into the institution through 'legal mail'" must be taken as true in deciding whether to grant the Inmates' motion for summary judgment. *See Nasir*, 350 F.3d at 368.

More importantly, the September Report outlined much more than only "a few isolated violations" of the DOC's old legal mail policy. *Fontroy*, 485 F. Supp. 2d at 599. As explained in the Report's preface, the instances of mail abuse mentioned in the Report are merely a "*random sampling* of incidents involving legal mail abuse." (Emphasis added.) According to the Report, the random sampling "illustrate[s] that [legal mail abuse] is an ongoing problem that is not going away." Therefore, the Report is evidence of larger systemic problems with the DOC's old mail policy.

Additionally, we cannot agree with the distinction that the District Court drew between "harmless" and "dangerous" contraband. *Id*. at 597. There is no meaningful difference. Even if some pieces of contraband may be less dangerous than others, an inmate's possession of any items that the DOC has classified as contraband would pose some risk to prison safety and security. At a minimum, it flouts prison rules and creates inequality among prisoners. This chips away at the DOC's ability to maintain safe and orderly penal institutions.

15

We admit that there is much less evidence linking falsified court mail, as opposed to fake attorney mail, with attempts to smuggle contraband. *See Fontroy*, 485 F. Supp. 2d at 599 (noting the "scant evidence of demonstrable safety and security threats associated with court mail"). This is not enough, however, to persuade us that the DOC's new policy is unconstitutional. If court mail policies did not change along with attorney mail policies, it is obvious that the abuse of the legal mail system could continue with ease: to circumvent the new attorney mail policy, individuals could simply forge a court's return address on the envelope instead of an attorney's. This is a sufficient reason to modify court mail policies even absent evidence of actual abuse. *See Jones*, 461 F.3d at 361 ("[S]atisfying [the rational connection burden] may or may not require evidence; where the connection is obvious, common sense may suffice . . . .").

We believe that the District Court erred in downplaying the implications of changing the location in which certain mail is opened and inspected for the first time. *See Fontroy*, 485 F. Supp. 2d at 598 ("All legal and court mail, with or without a control number, is still opened and inspected by the staff. If there is contraband, it will be discovered. The difference is where . . . ."). Here, as noted above, the September Report and the Escape Report pointed out that increased off-site inspection enhances security and safety by preventing contraband from entering the prison in the first instance, and by increasing the likelihood that the contraband will be discovered through the use

16

of professional Corrections Mail Inspectors with more time and experience. Additionally, unlike the District Court, we are less certain that "[i]f there is contraband, it will be discovered." In this case, which staff member conducts the inspection—a Corrections Mail Inspector whose only responsibility is inspecting mail, or a Housing Unit Officer with various cellblock responsibilities—can affect the probabilities of discovering contraband. As a result, changing the location of mail inspection from within the cellblock to outside the facility perimeter can yield clear safety and security benefits.

Since sufficient evidence demonstrates a rational connection between the DOC's new mail policy and its interest in prison security and safety, we believe that the policy passes the first step of the *Turner* analysis

B.

Moving to *Turner*'s second step, we believe that all three factors counsel in favor of holding the DOC's new mail policy constitutional.

First, "[w]ere it shown that no alternative means of [exercising the circumscribed right] existed . . . it would be some evidence that the regulations were unreasonable." *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003). Here, however, the Inmates have alternative means of ensuring that their First Amendment rights are not infringed upon. Control Numbers are

17

easily obtained upon request and, when used, allow the Inmates to communicate with attorneys and courts just as they did under the DOC's old mail policy. In addition, the DOC treats hand-delivered court and attorney correspondence as Privileged Correspondence even without a Control Number, and attorneys can communicate with inmates by phone or in-person.

Like the District Court and the Inmates, we are concerned that the Inmates cannot force attorneys and courts to obtain and use Control Numbers. *See Fontroy*, 485 F. Supp. 2d at 599–600. Indeed, some attorneys and all courts have refused the Inmates' repeated requests to do so. Additionally, as the District Court correctly noted, "[t]he current procedure as applied to court mail is even more onerous than as applied to legal mail. The inmate has no relationship with the sender and cannot require the sender to apply for and use a control number. Nor can the DOC or a court." *Fontroy*, 485 F. Supp. 2d at 599. Finally, unlike most attorney communications, most incoming court correspondence either cannot or will not be made by phone or in person.

We acknowledge that these problems make the DOC's new mail policy a less-than-ideal means of accommodating the Inmates' important First Amendment rights. Nonetheless, we cannot overlook that alternatives are, in fact, available under the DOC's new policy. This is all *Turner* requires. *See Overton*, 539 U.S. at 135 ("Alternatives to [the regulation] need not be ideal, . . . ; they need only be available."). Accordingly, the

18

availability of alternatives favors holding the DOC's new mail policy constitutional.

Second, in assessing the burden on prison resources that accommodating the Inmates' First Amendment rights would have, we "should be particularly deferential to the informed discretion of corrections officials" where an accommodation "will have a significant 'ripple effect' on fellow inmates or on prison staff." *Turner*, 482 U.S. at 90. Here, such deference is warranted. We reject the Inmates' argument that a return to the old DOC mail policy places no burden on prison resources simply because the old regulations have been in place since the 1970s.[11] We also disagree with the District Court's reasoning

---

[11]The Inmates argue that *Bieregu* compels a contrary conclusion. *See* 59 F.3d at 1458 ("To accommodate plaintiff's rights to free speech and court access by opening his incoming court mail only in his presence places no burden at all on guards, prisoners, and the allocation of prison resources: it is what the regulations have required since 1985."). In *Bieregu*, however, the plaintiff "d[id] not attack the general [prison] scheme for handling mail . . . ." *Id*. at 1449. Instead, the plaintiff challenged the prison's pattern and practice of opening his court mail outside of his presence. *Id*. Therefore, we distinguish *Bieregu* on its facts. While conforming prison officials' treatment of a single prisoner's mail to an existing policy applicable to the rest of the prison population may pose no burden on prison resources, it is an entirely different problem with substantially different consequences when the prisoner

19

that the low daily percentage volume of legal mail, requirements for hand delivery of court mail and legal mail to inmates not housed in general population, and the extra step of checking mail for a Control Number, mean that reverting to the old policy would place "no real burden upon the prison staff . . . ." *Fontroy*, 485 F. Supp. 2d at 600. Both the Inmates and the District Court have ignored the factors that prompted the change in the first place. The new policy has reduced the amount of mail warranting treatment as Privileged Correspondence, which means that Housing Unit Officers spend less time inspecting mail and more time addressing other prison safety and security issues. The new policy also makes smuggling contraband into the prison more difficult. These improvements suggest that returning to the old policy has the potential of causing a "ripple effect" on other inmates and prison staff. Accordingly, we should be deferential to the DOC's informed discretion here.

Third, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91. The Inmates claim that the DOC's old mail policy is such an alternative. Again, the Inmates have ignored the evidence offered to justify the new mail policy in the first place—the instances of legal mail abuse outlined in the Escape Report, September Report,

requests a change to the policy itself.

20

and Ulisny's and Beard's testimony. As discussed above, this demonstrates weaknesses in the old legal mail system and the deleterious effects of these weaknesses on prison safety and security. The DOC's revised policy was designed to address one of these weaknesses: the difficulties in ensuring that only legitimate legal mail is treated as Privileged Correspondence. Accordingly, the Inmates' proposed alternative cannot be achieved at a *de minimis* cost to valid penological interests.

Finally, the Inmates point us to the mail policy employed by the Federal Bureau of Prisons ("BOP"). Under the BOP's policy, incoming mail is opened and inspected for the first time in the presence of an inmate "if the sender is adequately identified on the envelope, and the front of the envelope is marked 'Special Mail—Open only in the presence of the inmate'." 28 C.F.R. § 540.18. The Inmates argue that the BOP's less burdensome requirements should persuade us that the DOC's revised mail policy is unconstitutional. It does not. The constitutionality of the BOP's and DOC's respective mail policies should be analyzed on their own terms. Assuming that the BOP's policy is constitutional does not necessarily mean that the DOC's more demanding policy is not. Absent any authority suggesting that the BOP's policy is at the outer limits of constitutionality, we decline to afford the BOP's policy any persuasive weight in this case.

In sum, all three factors in the second step of our *Turner* analysis weigh in favor of upholding the DOC's new

21

mail policy. Since the DOC's new mail policy passes *Turner*'s two-step test, we will reverse the District Court's decision to grant the Inmates' motion for summary judgment.

IV.

We next address the DOC Officials' claim that the District Court should have granted their cross-motion for summary judgment. The legal analysis we employ here is identical to the one we used to evaluate the District Court's decision to grant the Inmates' motion for summary judgment. Factually, however, we must view the record in the light most favorable to the Inmates. *Nasir*, 350 F.3d at 368. Additionally, summary judgment is inappropriate if the Inmates have raised a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Emory v. AstraZeneca Pharms. LP*, 401 F.3d 174, 179 (3d Cir. 2005).

Viewing the record in the light most favorable to the Inmates, we see some evidence to support a conclusion that the Corrections Mail Inspectors are no more skilled at discovering contraband than the Housing Unit Officers are. Ulisny testified at her deposition that she did not know of "any type of contraband that can be detected in court mail, when its [sic] opened outside of the inmate's presence, that couldn't be detected if it was opened in the inmate's presence . . . ." Additionally, John Murray, a corrections officer with 25 years of experience, testified at his deposition that he was generally able to identify contraband while inspecting mail, even without

22

special training for inspecting mail in front of an inmate.

Although this evidence casts doubt on the revised DOC mail policy's actual ability to enhance prison security and safety, it does not undermine the DOC Officials' cross-motion for summary judgment. Since the DOC Officials have an undisputed legitimate governmental interest in maintaining prison safety and security, all they need to do to prevail is demonstrate "that the policy drafters 'could rationally have seen a connection' between the policy and [the penological interest]." *Jones*, 461 F.3d at 360. This burden is "slight." *Id*. Here, as explained above, the analysis and conclusions contained in the Escape Report and September Report are enough to meet this burden. Indeed, even if the Corrections Mail Inspectors are no more skilled at discovering contraband than the Housing Unit Officers are, the two Reports suggest other ways in which improving legal mail verification techniques could enhance prison safety and security: reducing the amount of fake legal mail treated as Privileged Correspondence would 1) decrease the amount of time that the on-site Officers have to spend on mail inspection; and 2) decrease the amount of contraband that makes its way past prison gates in the first place.

The Inmates also have offered nothing to contradict the factual assertions contained in the Escape Report and September Report. They have only recharacterized the reports as inconclusive or representative of only a few isolated incidents. This is insufficient to raise the genuine issue of fact necessary

23

to survive summary judgment. Likewise, the Inmates have raised no factual issues that would change the *Turner* step two analysis that we conducted above. Therefore, we hold that the DOC Officials' cross-motion for summary judgment should have been granted.

V.

Although application of *Turner*'s two-step test is sufficient by itself to satisfy us that the DOC's new mail policy is constitutional, we find additional support for our holding in language of the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539 (1974). In *Wolff*, the Court addressed the issue of "whether letters determined or found to be from attorneys may be opened by prison authorities in the presence of the inmate or whether such mail must be delivered unopened if normal detection techniques fail to indicate contraband." 418 U.S. at 575. As part of its decision, the Court addressed the Court of Appeals' statement that "[i]f there was doubt that a letter was actually from an attorney, 'a simple telephone call should be enough to settle the matter.'" *Id*. at 575 (citation omitted). In the Court's view, this "impl[ied] that officials might have to go beyond the face of the envelope, and the 'privileged' label, in ascertaining what kind of communication was involved." *Id*.

The Court rejected the Court of Appeals' approach as unworkable. *Id*. at 576. The Court pointed out that "[i]f prison officials had to check in each case whether a communication

24

was from an attorney before opening it for inspection, a near impossible task of administration would be imposed." *Id*. The Court, however, did approve of some other methods for determining whether certain mail was actually from an attorney—methods that extend beyond the face of the envelope:

> We think it entirely appropriate that the State require any such communications to be specially marked as originating from an attorney, with his name and address being given, if they are to receive special treatment. It would also certainly be permissible that prison authorities require that a lawyer desiring to correspond with a prisoner, first identify himself and his client to the prison officials, to assure that the letters marked privileged are actually from members of the bar.

*Id*. at 576–77. Here, the Control Numbers that the DOC requires act as both a "special mark" identifying communications as originating from an attorney and also as a means of identifying the attorney to prison officials in order to "assure that the letters marked privileged are actually from members of the bar." *Id*. As a result, *Wolff* weighs in favor of upholding the constitutionality of the DOC's new mail policy.

## VI.

Compared with the old mail policy, the DOC's new policy does place an additional burden on the Inmates' First

25

Amendment rights. Upon their incarceration, however, the Inmates "necessarily sacrifice[d] many of the constitutional rights available to non-incarcerated citizens." *Jones*, 461 F.3d at 360. Therefore, to persuade us that the DOC's new mail policy is constitutional, the DOC Officials need only show that it is "reasonably related to legitimate penological concerns." *Turner*, 482 U.S. at 89. Here, they have done so, and we will reverse.